**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

ROYAL CONSUMER PRODUCTS LLC

                    Plaintiff,

      vs.

CVS PHARMACY, INC.,

                    Defendant.

Case No. 3:26-cv-698

May 6, 2026

**COMPLAINT**

Plaintiff Royal Consumer Products LLC ("Plaintiff" or "RCP"), by its undersigned counsel, Meister Seelig & Schuster PLLC, for its Complaint against Defendant CVS Pharmacy, Inc. ("Defendant" or "CVS"), alleges as follows:

**I.    Nature of the Action**

1.    This is an action for breach of contract, breach of implied contract, promissory estoppel, and unjust enrichment.

2.    RCP seeks damages resulting from CVS's failure to honor its promises to purchase products from RCP.

3.    RCP also seeks compensation from CVS for CVS's wrongful inducement of RCP to CVS's benefit and RCP's detriment.

**II.    The Parties Jurisdiction and Venue**

4.    Plaintiff RCP is a Delaware limited liability company headquartered at 108 Main Street, Norwalk, Connecticut, 06851.

5.    RCP's sole member is Mafcote, Inc. ("Mafcote").

6.    Mafcote is a Delaware corporation headquartered in Norwalk, Connecticut.

1

7. Mafcote is a citizen of Delaware and a citizen of Connecticut for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

8. Therefore, RCP is a citizen of Delaware and a citizen of Connecticut for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

9. Defendant CVS is a Rhode Island corporation headquartered at One CVS Drive, Woonsocket, Rhode Island 02895.

10. Therefore, Defendant CVS is a citizen of Rhode Island for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

11. Pursuant to 28 U.S.C. § 1332, the Court has subject matter jurisdiction over this action because there is complete diversity of citizenship and there is more than $75,000.00 in dispute in this action.

12. The Court has personal jurisdiction over CVS pursuant to Conn. Gen. Stat. § 52-59(b) because CVS has operated and transacted business within Connecticut, generating substantial sales in the state from agreements with RCP.

13. In addition, the subject of this action is a contract made by CVS within the state of Connecticut.

14. CVS' performance was due in Connecticut, and CVS directed substantial activity into Connecticut as outlined herein over a period of several years in entering into, performing under, and ultimately breaching its obligations to RCP.

15. Defendant CVS is registered to do business in Connecticut as a foreign corporation and has appointed as its agent for service within Connecticut the CT Corporation System, 357 East Center Street, Suite 2J, Manchester, Connecticut 06040-4471.

16.     Venue is proper because RCP is headquartered in Norwalk, Connecticut.

**III.    Facts Common to All Counts**

17.     Plaintiff RCP is a leading manufacturer of quality paper products, including designer stationery, poster boards, foam boards, project boards, and project letters.

18.     RCP's predecessor entity was established in 1911.

19.     RCP is headquartered in Norwalk, Connecticut where its sole member, non-party Mafcote is also headquartered.

20.     Defendant CVS is a leading retail pharmacy chain with approximately 9,600 stores across the country.

21.     In addition to prescription drugs, CVS sells an array of products in these stores ranging from skincare and fragrances to groceries, toys, and paper products.

22.     Among the retail products CVS sells are poster boards, foam boards, project boards, and project letters.

23.     CVS has marketed itself as selling a wide variety of poster board, foam board, project board, and project letter offerings, and holds itself out as a "go to" retail store for last-minute paper materials.

24.     In this capacity, RCP and CVS enjoyed a business relationship for approximately the last twenty-five years; one that was mutually beneficial and profitable, as recited herein.

25.     CVS has partnered with RCP for many of CVS' poster boards, foam boards, project boards, and project letters.

26.     Together RCP and CVS drove strong growth and market share gains for each of their respective businesses.

27.     For its part, CVS's convenient store locations in each of the 50 states (including 4 in Norwalk, Connecticut alone) have opened a customer base to RCP that was otherwise inaccessible.

28.     On the other hand, RCP's domestic sourcing, manufacturing, and distribution capabilities and patented technology have allowed RCP to provide excellent service and steady delivery of inventory to CVS, even despite macro global events like tariff volatility and the COVID-19 pandemic.

29.     For example, in 2025 RCP achieved 100% fulfilment for CVS and CVS enjoyed 22% sales growth across the RCP offerings.

30.     CVS specifically noted to RCP in writing the strong growth driven by RCP and RCP's consistent performance as a willing partner for a quarter century.

31.     CVS and RCP have often memorialized the terms of their arrangements in a variety of writings including letter commitments, contracts, and emails.

32.     The contractual history between CVS and RCP has generally consisted of four-year agreements pursuant to which RCP manufactures and ships to CVS a variety of poster boards, foam boards, project boards, and project letters in exchange for negotiated pricing.

33.     The assortment of products RCP has manufactured is highly tailored to CVS, with most items specially manufactured for CVS.

34.      Within the four-year terms of their agreements, CVS and RCP collaborated on two, two-year planograms ("POG"), through which the parties would establish the particular assortment of products and placement for CVS' stores to maximize sales.

35.     RCP purchased the raw materials needed to manufacture the paper board

products or "stock keeping units" ("SKU") in advance[1] and manufactured the SKUs in advance to ensure timely delivery to CVS.

### A. The 2014 Agreement

36. By way of example, in 2014 RCP and CVS negotiated a 4-year agreement.

37. In consideration for CVS' four-year contractual agreement, RCP supplied racks for its products in CVS stores at a cost to RCP of $891,905.00.

38. In reliance on these promises, RCP purchased in advance raw materials needed to timely fill orders from CVS and began manufacturing the paper board products correlating to each SKU.

39. By manufacturing the SKUs ahead of CVS' specific orders, RCP could ensure timely delivery.

40. As RCP manufactured the products for CVS, RCP stored the SKUs in inventory until the time of their delivery to CVS.

### B. The 2020 Agreement

41. In 2019, RCP and CVS began negotiating another four-year agreement and a POG outlining the SKUs that CVS would purchase from RCP.

42. In connection with this agreement, CVS promised to purchase from RCP poster board, foam board, project board, and project letter offerings for CVS' stores for four years under multiple POGs.

43. RCP made an investment for store signage and rack shelves for CVS in excess of $1,000,000.00.

44. In reliance on these promises, RCP once again purchased in advance raw

---

[1] For example, in 2019, SKU Item # 24324 referred to a "White Poster board" and SKU Item #27834 referenced a "Premium Black Poster Board."

materials needed to timely fill CVS' orders and manufactured in advance the paper board products correlating to each SKU to ensure timely delivery to CVS.

45. As RCP manufactured the products for CVS, RCP again stored the SKUs in inventory until the time of their delivery to CVS.

**C. The 2024 Agreement and the Associated 2024 & 2026 POGs**

46. In 2023, RCP and CVS once again began negotiating a 4-year agreement and a POG outlining the SKUs that CVS would purchase from RCP.

47. CVS contacted RCP in October 2023 and indicated its intent to cease purchasing 14 SKUs, a process known as "delisting." Additionally, CVS requested that RCP propose $800,000 in cost savings measures to CVS.

48. At the time, CVS wrote to RCP: "We anticipate that this move will unlock space for more innovative SKUs, enhance our customer shopping experience, and generate a positive DNP impact for CVS, but recognize that it will also have an impact on Royal Consumer Products and are willing to discuss ways in which you can improve your economics. To consider maintaining your assortment, CVS will require $0.8M in incremental annual funding or equivalent cost reduction."

49. RCP obliged CVS's inducement of investment and further cost savings to continue the size of the parties' relationship in 2024 and beyond.

50. In November 2023, RCP proposed a series of terms geared towards saving CVS approximately $451,000.

51. Under these terms, RCP would (i) implement a 12% "volume rebate" on net purchases made by CVS; (ii) increase that "volume rebate" to 13% for an estimated total rebate of $351,000 if CVS made purchases of at least $2.7 million; (iii) implement $40,000

6

in "markdowns" on SKUs and (iv) absorb $60,000 in disposal fees and other deductions.

52.     In return, CVS would (i) continue ordering the SKU count that it previously ordered under the 2020 agreement; (ii) issue a STOP directive to RCP regarding the 14 SKUs that CVS had previously requested to "delist"; (iii) consider purchasing 2 new certificate and certificate cover related SKUs; (iv) implement an agreement regarding delivered SKUs that were unsaleable; and (v) continue purchasing in accordance with the agreement for four years under POGs.

53.     CVS largely agreed with RCP's proposed terms but rejected RCP's request to implement an agreement regarding unsaleable merchandise.  CVS further agreed to only "delist" 4 SKUs (instead of 14).

54.     As negotiations continued, RCP offered to (i) implement a 16% "volume rebate" on net purchases made by CVS after March 15, 2024; (ii) increase that "volume rebate" to 17%  if CVS made purchases of at least $2.7 million to be paid in December of the same year; (iii) implement $40,000 in "markdowns" on SKUs (iv) absorb $60,000 in disposal fees and other deductions; and (v) "delist" 8 SKUs in connection with its delivery of the poster board related SKUs to CVS.

55.     In return, CVS promised to (i) purchase 4 "new" SKUs and (ii) and implement POG changes in stores through 2028 albeit via a 2024 POG for 2 years and a 2026 POG for 2 years.

56.     CVS knew from its negotiations with RCP and the lengthy and consistent history of their business relationship, that CVS' purchases from RCP needed to be "spread" out over many years in order for RCP to ultimately make a profit.

57.     Significantly, the parties also promised that if any issues arose between

them, they would partner with each other in order to find a mutually agreeable solution (the "Agree to Partner Provision").

58. By December 2023, CVS prepared and circulated a written agreement memorializing these terms entitled the Vendor Support and Funding Agreement (the "Funding Agreement").

59. Both parties executed the Funding Agreement.

60. The Funding Agreement made clear that the parties' agreement was for a four-year term.

61. Under the heading "CVS commitments to Vendor," the Funding Agreement states that "CVS will implement POG changes in the Posterboard Section for the 2024 POG through the 2026 POG."

62. Each POG under the 2024 Agreement, the 2024 POG and the 2026 POG, was agreed to be for two years, in accordance with the parties' longstanding course of performance.

63. The Agree to Partner Provision lists as an obligation of CVS in relevant part that "[s]hould any issues arise from the above agreements between CVS and Vendor throughout the effective agreement term, both parties agree to partner in order to find a mutually agreeable solution."

64. Under these new terms, RCP promised to (i) implement a 16% "volume rebate" on net purchases made by CVS after March 15, 2024; (ii) increase that "volume rebate" to 17% if CVS made purchases of at least $2.7 million to be billed in January of the next year; (iii) implement $40,000 in "markdowns" on SKUs (iv) absorb $60,000 in disposal fees and other deductions; and (v) "delist" 8 SKUs in connection with its delivery

of the poster board related SKUs to CVS.

65.     In return, CVS promised to (i) purchase 4 "new" SKUs, and (ii) continue purchasing in accordance with the agreement for four years under two separate two-year POGs, one POG commencing in 2024 for two years and the other POG commencing in 2026 for two years.

66.     The Agree to Partner Provision lists as an obligation of CVS in relevant part that "[s]hould any issues arise from the above agreements between CVS and Vendor throughout the effective agreement term, both parties agree to partner in order to find a mutually agreeable solution."

67.     As of May 2024, RCP had a scheduled price increase on certain products. In reliance on the parties' four-year commitment to one another, at CVS' request RCP agreed to delay that price increase by several months at a cost to RCP of approximately $45,000.00.

68.     In reliance on the 2024 agreement, the parties' longstanding relationship, and CVS' representations, RCP purchased raw materials well in advance to ensure it could promptly fill CVS' specific orders and began manufacturing the paper board products correlating to each SKU to ensure timely delivery.

69.     As RCP manufactured the products for CVS, RCP stored the SKUs in inventory until the time of their delivery to CVS.

70.     As CVS knew, the products RCP manufactures for CVS are specifically manufactured for CVS, and most of the products RCP specifically manufacturers for CVS are not broadly sold in the market by other retailers.

**D. CVS Terminates Its Relationship With RCP**

71.     CVS concealed its misconduct from RCP until the moment it announced its intentional breach.

72.     In December 2025 and early January 2026, CVS sent projections to RCP for the first quarter of 2026, with sales totaling in excess of $615,160.00 for the first quarter of 2026.

73.     As always, RCP relied upon CVS projections to ready the inventory to meet CVS' projections on time, and planned for future quarter productions.

74.     CVS gave no indication to RCP that it was surreptitiously planning to pull the rug out from under RCP.

75.     It is inconceivable that CVS could make a decision to breach its agreement with RCP without planning.

76.     CVS kept luring RCP to produce inventory and plan for future deliveries and sales after CVS decided to unlawfully terminate its business with RCP.

77.     RCP reasonably relied on the history with CVS and CVS' representations to RCP to proceed full speed ahead anticipating high volume sales through 2026, 2027, and the first half of 2028 in accordance with the parties' 2024 agreement.

78.     As a matter of law, the 2024 agreement included the implied covenant of good faith and fair dealing.

79.     As RCP expended substantial resources and devoted substantial capital to deliver the 2026 SKUs beginning in January 2026, on January 12, 2026 CVS abruptly breached the parties' contract and announced its non-negotiable final decision to terminate the parties' long-standing relationship.

10

80.    CVS' about face was a stunning development.

81.    After partnering with CVS for a quarter century, RCP was blindsided by CVS' duplicitous misconduct.

82.    CVS admitted to RCP that, despite RCP's excellent performance and the strong growth CVS enjoyed as a result of RCP's performance, CVS received an offer from another supplier that it could not refuse.

83.    Even in its stunning announcement that it was walking away from the parties' agreement, CVS represented to RCP that it would continue purchasing through June 2026.

84.    However, CVS even reneged on that representation and immediately ceased placing orders in January 2026, leaving RCP with manufactured goods for CVS that CVS refused to accept and pay for.

85.    RCP responded to CVS's stunning announcement later that day on January 12, 2026 and requested that (i) CVS reconsider its rash decision and (ii) meet with RCP's representatives to discuss the development further.

86.    CVS responded by confirming that its decision was final and non-negotiable but nevertheless agreed to meet with RCP.

87.    During that meeting, CVS explained the reasoning for its decision but did not engage in any negotiations with RCP.

88.    On January 15, 2026, RCP communicated to CVS that RCP had already invested millions in resources based on CVS's promises to purchase paper board products from RCP until 2028.

89.    RCP further explained that its performance thus far was consistent with the

11

parties' prior course of conduct regarding the 2014 agreement and 2020 agreement, and all the POGs under those contracts.

90.     By February 2, 2026, CVS had begun "clearance sales" of RCP's paper board products in the stores located in Norwalk and had taken no steps to follow up with RCP regarding replenishing these paper board materials.

91.     On February 3, 2026, CVS contacted RCP and asserted (for the first time) that the parties did not have a multi-year commercial contract term or requirement to maintain their relationship through 2028.

92.     CVS also asserted that it was not obligated in any way to honor the promises it had previously made to RCP concerning the purchase of poster board products for the 2024-2028 term.

93.     In response, RCP wrote to CVS's General Counsel invoking the Agree to Partner Provision in an attempt to find a mutually agreeable solution to these circumstances.

94.     CVS never responded to RCP's overtures, blatantly breaching the parties' agreement and violating the Agree to Partner Provision and applicable law.

95.     The parties acted as partners for a quarter century, and yet CVS refused to even honor its commitment under the Agree to Partner Provision, which mandated cooperation and a good faith obligation to find a solution in the event any issues arose between the parties.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

96.      Plaintiff incorporates and realleges the foregoing allegations in paragraphs 1 through 95 of the Complaint as if fully restated and repeated herein.

12

97.     The 2024 agreement is a binding contract between RCP and CVS.

98.     The 2024 agreement obligated RCP to (i) implement a 16% "volume rebate" on net purchases made by CVS after March 15, 2024; (ii) increase that "volume rebate" to 17%  if CVS made purchases of at least $2.7 million to be billed in January of the next year; (iii) implement $40,000 in "markdowns" on SKUs; (iv) absorb $60,000 in disposal fees and other deductions; (v) "delist" 5 SKUs in connection with RCP's delivery of the 2025 poster board related SKUs to CVS; and (vi) subsidize $200,000 in expenses to a third party merchandizer assisting CVS in the creation of uniform planograms across all stores.

99.     In return, CVS promised to (i) purchase SKUs from RCP for estimated sales in excess of $8,500,000.00 through June 2028; (ii) implement POG changes for both the 2024 two-year POG and the 2028 two-year POG; and (iii) invoke the Agree to Partner Provision in order to resolve any issues arising between the parties.

100.    As a matter of law, the 2024 agreement between the parties included the implied covenant of good faith and fair dealing.

101.    As CVS knew, the products RCP manufactures for CVS are specifically manufactured for CVS, with the overwhelming majority of the products not broadly sold in the market by other retailers.

102.    RCP fulfilled all of its obligations under the parties' agreement, including, but not limited to, by (i) implementing a 16% "volume rebate" on the net purchases made by CVS after March 15, 2024; (ii) absorbing $60,000 in disposal fees and other deductions; (iii) "delisting" the 5 SKUs in connection with RCP's delivery of the 2025 poster board related SKUs to CVS; and (iv) subsidizing the $200,000 in expenses to the third party merchandizer assisting CVS in the creation of uniform planograms across all stores.

13

103.    CVS materially breached the  parties' agreement by failing to (i) purchase products from CVS through June 2028 for estimated sales in excess of $8,500,000.00; (ii) collaborate with RCP on the 2026 two-year POG to set the assortment for time period running through June 2028 to maximize sales, and (iii) comply with  the Agree to Partner Provision in order to find a mutually agreeable solution to any alleged issues between the parties under the 2024 agreement.

104.    As a result of CVS's abrupt breach of contract, RCP has approximately $1,500,000.00 worth of inventory specifically designed, manufactured, and packaged for CVS.

105.    Had CVS fulfilled its obligations under the contract and completed the POGs through June 2028, RCP's profit from the breach in January 2026 through June 2028 would have been in excess of $1,800,000.00.

106.    RCP made substantial investments specifically for the CVS POGs, which were based upon CVS' commitment to carry out the POG through June 2028 at the agreed upon volume.

107.    As a result of CVS' breach, RCP lost the value of those substantial investments, which are estimate to be well in excess of $200,000.00.

108.    RCP made raw material purchase commitments to fulfill its obligations under the contract with CVS.

109.    As a result of CVS' breach, RCP has been damaged based upon its raw material commitments in an amount to be determined at trial.

110.    As a direct result of CVS's breach of the Funding Agreement as amended and modified, CVS has damaged RCP in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**(Breach of Implied Contract)**

111.    Plaintiff incorporates and realleges the foregoing allegations in paragraphs 1 through 110 of the Complaint as if fully restated and repeated herein.

112.    As an alternative to Plaintiff's First Cause of Action, Plaintiff pleads its Second Cause of Action.

113.    By May 2024, CVS and RCP had entered into and formed an implied contract whereby RCP would manufacture and deliver poster board related SKUs to CVS for a four-year term as RCP had previously done in connection with the 2014 POG and 2020 POG. This implied contract specifically obligated CVS to purchase poster board related SKUs from RCP for the period 2024-2028 in which CVS promised to (i) purchase 24 SKUs, (ii) implement POG changes in stores through 2028 for estimated sales in excess of $8,500,000.00 through June 2028, and (iii) invoke the Agree to Partner Provision in order to resolve any issues arising between the parties.

114.    As a matter of law, the implied contract between the parties included the implied covenant of good faith and fair dealing.

115.    As CVS knew, the products RCP manufactures for CVS are specifically manufactured for CVS, with the overwhelming majority of the products not broadly sold in the market by other retailers.

116.    RCP performed at the request of CVS under a reasonable expectation that CVS would compensate RCP including for RCP's (i) implementation of a 16% "volume rebate" on the net purchases made by CVS after March 15, 2024; (ii) absorption of $60,000 in disposal fees and other deductions; (iii) "delisting" of 5 SKUs in connection with RCP's delivery of the 2025 poster board related SKUs to CVS; and (iv) subsidization of the

15

$200,000 in expenses to the third party merchandizer assisting CVS in the creation of uniform planograms across all stores.

117.    CVS knew, or reasonably should have known, that RCP expected payment for its performance under this implied contract because RCP had previously performed in a similar fashion for eight years in connection with the 2014 agreement and 2020 agreement and received compensation from CVS in both instances.

118.    Nevertheless, CVS materially breached the  parties' implied agreement by failing to (i) purchase products from CVS through June 2028 for estimated sales in excess of  $8,500,000.00; (ii) collaborate with RCP on the 2026 two-year POG to set the assortment for time period running through June 2028 to maximize sales, and (iii) comply with  the Agree to Partner Provision in order to find a mutually agreeable solution to any alleged issues between the parties under the 2024 agreement.

119.    As a result of CVS's abrupt breach of contract, RCP has approximately $1,500,000.00 worth of inventory specifically designed, manufactured, and packaged for CVS.

120.    Had CVS fulfilled its obligations under the contract, RCP's profit from the breach in January 2026 through June 2028 would have been in excess of $1,800,000.00.

121.    RCP made substantial investments specifically for the agreement with CVS, which were based upon CVS' commitment to continue the parties' relationship through June 2028 at the agreed upon volume and in accordance with the parties' course of performance.

122.    As a result of CVS' breach, RCP lost the value of those substantial investments, which are estimated to be well in excess of $200,000.00.

123. RCP made raw material purchase commitments to fulfill its obligations under the contract with CVS.

124. As a result of CVS' breach, RCP has been damaged based upon its raw material commitments in an amount to be determined at trial.

125. As a direct result of CVS's breaches, CVS has damaged RCP in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**(Promissory Estoppel)**

126. Plaintiff incorporates and realleges the foregoing allegations in paragraphs 1 through 125 of the Complaint as if fully restated and repeated herein.

127. As an alternative to Plaintiff's First Cause of Action, Plaintiff pleads its Third Cause of Action.

128. CVS made clear and definite promises in 2024 to RCP to (i) purchase poster board related SKUs from RCP for the period 2024-2028 for estimated sales in excess of $8,500,000.00, (ii) collaborate with RCP on a two-year POG commencing in 2024 and a further two-year POG commencing in 2026 in order to modify the assortment in CVS stores and maximize sales, and (iii) invoke the Agree to Partner Provision in order to resolve any issues arising between the parties.

129. CVS should have reasonably expected that its promise to RCP would induce detrimental action on the part of RCP based on the parties' 25-year business relationship including, without limitation, their work together on the 2014 agreement and the 2020 agreement.

130. RCP was in fact induced to take detrimental action in reliance on CVS's promises including by (i) purchasing in advance the raw materials needed to timely

17

manufacture poster board related SKUs for CVS; (ii) manufacturing and storing in advance poster board related SKUs for CVS; (iii) implementing a 16% "volume rebate" on net purchases made by CVS after March 15, 2024; (iv) implementing $40,000 in "markdowns" on SKUs; (v) absorbing $60,000 in disposal fees and other deductions; (vi) "delisting" certain SKUs in connection with its delivery of poster board related SKUs to CVS; (vii) subsidizing $200,000 in expenses to a third party merchandizer assisting CVS in the creation of uniform planograms across all stores; and (viii) delaying price increases at CVS' request for several months at a cost to RCP in excess of $45,000.00.

131. As CVS knew, the products RCP manufactures for CVS are specifically manufactured for CVS, with the overwhelming majority of the products not broadly sold in the market by other retailers.

132. CVS failed to honor its clear and definite promises to RCP for the years 2026, 2027 and 2028.

133. As a result of CVS's failure to honor its clear and definite promises, RCP has approximately $1,500,000.00 worth of inventory specifically designed, manufactured, and packaged for CVS.

134. Had CVS fulfilled its obligations and promises to RCP, RCP's profit from January 2026 through June 2028 would have been in excess of $1,800,000.00.

135. RCP made substantial investments specifically for CVS, which were based upon CVS' commitment through June 2028 at the agreed upon volume.

136. As a result of CVS' misconduct, RCP lost the value of those substantial investments, which are estimate to be well in excess of $200,000.00.

137. Based on CVS' commitment to purchase from RCP through 2028, RCP

granted CVS massive rebates of 16% throughout 2024 and 2025.

138.    In 2024, RCP granted CVS 16% rebates totaling $403,700.00.

139.    In 2025, RCP granted CVS 16% rebates totaling $323,321.00.

140.    RCP never would have granted such massive rebates but for CVS' representations that it would purchase the SKUs from RCP at the agreed upon volumes through June 2028.

141.    The rebates only make financial sense for RCP where it obtains large volume sales over a long term, such that RCP can plan both for steady revenue and plan its production in the most economical fashion.

142.    CVS knew that RCP was relying on CVS' volume and term commitments in granting CVS the massive rebates and overall pricing structure.

143.    Despite knowing it had induced RCP to grant the rebates by assuring RCP of the volume and term of the POG, CVS completely disregarded its commitments and abruptly announced its refusal to continue with the POG in January 2026.

144.    Based on CVS' promises to continue the mutually beneficial relationship between RCP and CVS, RCP agreed to delay a price increase by several months at a cost to RCP of approximately $45,000.00.

145.    RCP made raw material purchase commitments to fulfill its obligations under the contract with CVS.

146.    As a result of CVS' breach, RCP has been damaged based upon its raw material commitments in an amount to be determined at trial.

147.    As a direct result of CVS's failure to honor its promises, CVS has damaged RCP in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

148.    Plaintiff incorporates and realleges the foregoing allegations in paragraphs 1 through 147 of the Complaint as if fully restated and repeated herein.

149.    As an alternative to Plaintiff's First Cause of Action, Plaintiff pleads its Fourth Cause of Action.

150.    CVS made clear and definite promises in 2024 to RCP to purchase poster board related SKUs from RCP for the period 2024-2028 in which CVS promised to (i) purchase poster board products from RCP through June 2028 for estimated sales in excess of $8,500,000.00, (ii) collaborate with RCP on two, two-year POGs commencing in 2024 and 2026 concerning the assortment in CVS stores to maximize sales, and (iii) invoke the Agree to Partner Provision in order to resolve any issues arising between the parties.

151.    CVS should have reasonably expected that its promise to RCP would induce detrimental action on the part of RCP based on the parties' 25-year business relationship including their work together on the 2014 agreement and the 2020 agreement.

152.    RCP was in fact induced to take detrimental action in reliance on CVS's promises including by (i) purchasing in advance the raw materials needed to manufacture poster board related SKUs; (ii) manufacturing and storing in advance the requested poster board related SKUs; (iii) implementing a 16% "volume rebate" on net purchases made by CVS after March 15, 2024; (iv) implementing $40,000 in "markdowns" on SKUs; (v) absorbing $60,000 in disposal fees and other; (vi) "delisting" 5 SKUs in connection with its delivery of the 2025 poster board related SKUs to CVS; (vii) subsidizing $200,000 in expenses to a third party merchandiser assisting CVS in the creation of uniform planograms across all stores; and (viii) delaying price increases for several months at a cost to RCP in

excess of $45,000.00.

153.    Based on CVS' commitment to implement the POG in stores through 2028, RCP granted CVS massive rebates of 16% throughout 2024 and 2025.

154.    In 2024, RCP granted CVS 16% rebates totaling $403,700.00.

155.    In 2025, RCP granted CVS 16% rebates totaling $323,321.00.

156.    RCP never would have granted such massive rebates but for CVS' representations that it would continue the parties' relationship through June 2028.

157.    The rebates only make financial sense for RCP where it obtains large volume sales over a long term, such that RCP can plan both for steady revenue and plan its production in the most economical fashion.

158.    In addition, based upon CVS' promise of a four-year extension of the parties long relationship, RCP agreed to invest more than $300,000.00 for in-store improvements at CVS stores, and, by the time CVS abruptly and unlawfully pulled out of the relationship, RCP had already invested approximately $210,000 of its commitment.

159.    CVS knew that RCP was relying on CVS' volume and term commitments in granting CVS the massive rebates and overall pricing structure.

160.    Despite knowing it had induced RCP to grant the rebates by assuring RCP of the volume and term of the POG, CVS completely disregarded its commitments and abruptly announced its refusal to continue with the POG in January 2026.

161.    CVS has been unjustly enriched by inducing massively reduced pricing by RCP, including through the rebates, but disregarding its commitments that CVS used to induce RCP to grant CVS the massive price concessions, including through the rebates.

162.    Based on CVS' promises to continue the mutually beneficial relationship

between RCP and CVS, RCP agreed to delay a price increase by several months at a cost to RCP of approximately $45,000.00.

163.    As CVS knew, the products RCP manufactures for CVS are specifically manufactured for CVS, with the overwhelming majority of the products not broadly sold in the market by other retailers.

164.    As a result of CVS' unjust enrichment, CVS should be required to disgorge the entire unjustly received enrichment, in amount to be determined at trial, including, without limitation, the $727,021.00 in rebates granted by RCP to CVS in 2024 and 2025, and the approximately $210,000.00 of money invested by RCP for CVS' benefit based upon CVS' inducement and commitment.

**WHEREFORE**, RCP demands judgment against CVS as follows:

I.    An award of damages from CVS in an amount to be determined at trial;

II.    Disgorgement and payment to RCP the entirety of CVS' unjust enrichment;

III.    Prejudgment and post-judgment interest;

IV.    Costs; and

V.    Such other and further relief as the Court deems just and proper.

Dated:  Norwalk, Connecticut
    May 6, 2026

ROYAL CONSUMER PRODUCTS LLC

By: _/s/ Christopher J. Major_
        Christopher J. Major
        Meister Seelig & Schuster PLLC
        383 Main Avenue
        Suite 450
        Norwalk, Connecticut 06851
        Email: cjm@mss-pllc.com
        Tel: (203) 348-4244

*Attorneys for Plaintiff*

22